IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHEYENNE KELCH,<br><br>Plaintiff,<br><br>v.<br><br>THE OWL'S NEST DAYCARE & PRESCHOOL, LLC,<br><br>Defendant. | CIVIL DIVISION<br><br>Case No. 3:26-cv-01943 |

**COMPLAINT AND JURY DEMAND**

A. ***Preliminary Statement***

1. The plaintiff Cheyenne Kelch brings this action under The Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg to redress violations of her right to be free from employment discrimination and retaliation based upon her pregnancy. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* when that claim matures on April 3, 2027. A jury trial is demanded.

B. ***Jurisdiction***

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000gg., 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3. On or about April 3, 2026, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2026-1758. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue dated August 3, 2026.

5. This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C. ***The parties***

6. The plaintiff is an adult individual who, at all times material, resided in Six Mile Run, PA (Bedford County).

7. The defendant The Owl's Nest Daycare & Preschool, LLC ("The Owl's Nest") is an entity doing business in the Commonwealth of Pennsylvania. At all times material, the defendant had a place of business located at within this district, specifically 202 Grandview Street, Woodbury, PA 16695 (Bedford County).

8. At all times material, the defendant employed more than fifteen employees.

9. The defendant was the plaintiff's employer and is an employer within the meaning of The Pregnant Workers Fairness Act, 42 U.S.C. §2000gg.

D. ***Factual Background***

10. The plaintiff was employed by The Owl's Nest from November 4, 2024 until November 25, 2025.

11. The Owl's Nest provides daycare services.

12. The plaintiff was employed as a Group Supervisor. Her primary role was administrative tasks including doing interviews, and handling matters regarding state funding programs.

13. At all times relevant:

(a) Sarah Hall was the owner of The Owl's Nest.

(b) Kate Strayer was the Assistant Director.

(c) Hannah Clapper was a preschool teacher.

14. At all times relevant, the plaintiff performed the functions of her job competently and efficiently and was considered to be an excellent employee.

15. The plaintiff learned that she was pregnant with her first child on approximately April 2, 2025. She told Hall about her pregnancy on or about April 4, 2025. Hall responded that Clapper had also found out that she was pregnant and was due around the same time as the plaintiff. Hall remarked, "I don't know how the Owl's Nest will survive two of you being off at the same time."

16. Initially, Hall seemed supportive of the plaintiff, volunteering to cover her on April 17, 2025 when the plaintiff told her that she was having some strange symptoms and was going to the OB office to get checked.

17. On approximately June 4, 2025, Clapper messaged the plaintiff about a child at The Owl's Nest who had been diagnosed with Fifth Disease (Erythema Infectiosum). Fifth Disease is a relatively mild viral infection in children that often causes a bright red rash on the child's cheeks. The problem is that if a pregnant woman is infected, it can (but does not always) cause complications, including an increased chance of miscarriage and/or blood, hearing or liver problems with the unborn child. The plaintiff was concerned about being infected because she was exposed to the child with Fifth Disease. On top of this, the plaintiff previously had a miscarriage.

18. The plaintiff messaged Hall about her concerns. Hall responded that it probably was not a "big deal" and that it's more likely to be in a car accident driving to work than it is to contract Fifth Disease. Evidently, Hall told Strayer about the issue that the plaintiff raised with her. Strayer got upset with the plaintiff about her concerns and treated her rudely and

dismissively. The plaintiff decided to take off the next day because she was so shaken up by Strayer's hostility.

19. On or about June 17, 2025, Hall communicated with the plaintiff regarding her plans after she delivered the child. She also asked about Clapper's plans. The plaintiff informed Hall that Clapper planned to take 12 weeks off and to return to work part-time. The plaintiff also informed Hall that she was not sure how long she would need for leave because of all the variables associated with her pregnancy. The plaintiff told Hall that she definitely intended to return to work, probably within six to eight weeks after delivery.

20. On or about July 14, 2025, the plaintiff advised Hall that she intended to enroll her child when the plaintiff was medically cleared to return to work. The plaintiff asked about the rates for daycare. Hall responded that there were no discounts for babies, 50% off for children between 1 and 2 and that children 3 or above were free.

21. On October 13, the plaintiff had a nosebleed before going to work. She checked her blood pressure at home and it was high. While at work, she checked her blood pressure every hour. Her blood pressure remained consistently high. The plaintiff called her OB and was told to come to the OB's office immediately for monitoring. The plaintiff called Hall about the situation and told her that she was leaving to go to the OB.

22. The OB confirmed that the plaintiff's blood pressure was abnormally high. The plaintiff was sent to UPMC Bedford for labs and was told to go to UPMC Magee Women's Hospital (approximately 131 miles away) immediately for further evaluation.

23. The plaintiff was treated at UPMC Magee Women's Hospital. She was diagnosed with gestational hypertension. Preeclampsia could not be ruled out. The plaintiff stayed overnight and was discharged the next day.

24. On or about October 15, 2026, the plaintiff asked Hall if she wanted the plaintiff to document all of her doctor's visits or use the "weekly sticky note" which was used for documenting employee requests for time off or scheduling changes. Hall responded to just add it to the list. The plaintiff sent Hall all of the scheduled doctor appointments. Hall also responded, "I don't think you'll be working that long. I think they'll put you on bed rest soon."

25. On or about October 16, 2025, the plaintiff was diagnosed with Preeclampsia. Hall told the plaintiff that she will be okay and that she had to take care of herself.

26. On or about October 17, 2025, the plaintiff messaged Hall and informed her that the OB wanted her to go back to Pittsburgh due to the plaintiff experiencing pain in her upper right quadrant. Hall seemed to be supportive.

27. The plaintiff delivered her child on October 18, 2025.

28. The plaintiff had a baby shower on October 25, 2025. Although Hall was invited, she did not show up.

29. On November 23, 2025, the plaintiff messaged Hall about returning to work. The plaintiff also advised Hall that she wanted to bring her son to the Owl's Nest and to make arrangements to have him enrolled. Hall responded that there was no available space at the center for the plaintiff's child. Further, Hall tried to dissuade the plaintiff for enrolling her child in daycare, commenting that the baby was fragile and underweight. As an aside, taking care of a premature child at daycare is actually easier than full-term babies because a premature child typically sleeps throughout the day and does not require as much work. Further, none of the plaintiff's physicians told the plaintiff that she should not have her child placed in daycare.

30. Between approximately November 23 and 25, 2025, Hall told the plaintiff, via Facebook Messaging that the plaintiff should sign up to work for Walmart, delivering packages.

Surprisingly, Hall suggested the plaintiff could take her child with her while she was making deliveries. Hall also suggested that the plaintiff should start looking for an "at-home job" and to apply for social security for her son. Hall would not address the plaintiff's requests for returning to work at the Owl's Nest and was actively dissuading her from doing so.

31. On or about November 25, 2025, the plaintiff messaged Hall about when there would be an opening for the plaintiff's son at the Owl's Nest. Hall responded that she had "literally no idea" and that she would have to "figure it out." The plaintiff told Hall that she needed to return to work as soon as possible because her family needed the income and made it clear that she was ready to return to her job. Hall responded that the women in the area "don't typically work" and pushed the idea of the plaintiff finding a remote job.

32. It was clear to the plaintiff that Hall was dodging the issue of the plaintiff's return to her job at the Owl's Nest. At 11:17 pm on November 25, 2025, the plaintiff messaged Hall: *is this your indirect way of telling me I don't have a job to return to? If that's the case, I have a lot of things that need tending to.* Hall opened the message but did not respond.

33. Hall never contacted the plaintiff about returning to work and, on or about January 5, 2026, the plaintiff was removed from the group chats used by employees. The Owl's Nest terminated the plaintiff's employment.

34. The plaintiff was terminated because of her pregnancy. Any other reason articulated by the Owl's Nest is a pretext.

## FIRST CAUSE OF ACTION

35. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

36. The plaintiff was protected against discrimination and retaliation on the basis of her pregnancy pursuant to the PWFA.

37. The plaintiff was qualified for her position.

38. Despite her qualifications, the plaintiff was terminated. The reasons given for her discharge were a pretext.

39. The defendant's discharge of the plaintiff was because she was pregnant in violation of the PWFA.

40. The defendant's violation of the PWFA was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of discrimination based on pregnancy.

**SECOND CAUSE OF ACTION**

41. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

42. In addition to discrimination because she was pregnant, the plaintiff was retaliated against for engaging in protected activity, i.e., requesting time off in the form of maternity leave.

WHEREFORE, the plaintiff respectfully requests judgment be entered in her favor and against the defendant and that the defendant be required to provide all appropriate remedies under the PWFA and the PHRA (when that claim matures on April 3, 2027), including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*

Michael J. Bruzzese
Pa. I.D. No. 63306
220 Koppers Building
436 Seventh Avenue

Pittsburgh, PA 15219
(412) 281-8676
mjb@mjblawoffice.com

Counsel for the plaintiff

Dated: October 5, 2026